Kalima JENKINS, et al., Plaintiffs,

v.

STATE OF MISSOURI and Kansas City, Missouri School District, Defendants,

(American Federation of Teachers, Intervenor).

No. 77–0420–CV–W–4.

United States District Court, W.D. Missouri, W.D.

Sept. 15, 1987.

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., for plaintiffs.

James Borthwick, Shirley Keeler, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., and Allen R. Snyder, Hogan & Hartson, Washington, D.C., for defendant Kansas City Missouri School Dist.

Bartow Farr, III, Onek, Klein & Farr, Washington, D.C., and Michael Fields, Asst. Atty. Gen., Jefferson City, Mo., for defendant State of Mo.

Michael Gordon, Kansas City, Mo., for intervenor American Federation of Teachers.

### ORDER

RUSSELL G. CLARK, District Judge.

On August 3–6, and 10–12, 1987, this Court conducted a hearing on KCMSD's motion for approval of its long-range capital improvement plan. After careful consideration, the Court approves the plan as modified in this order and orders funding of those projects scheduled for completion by the fall of 1990. The KCMSD also submitted for the Court's approval a student transportation plan for the long-range magnet school plan in 1987–88. The State objects to the plan and suggests that a hearing on the plan may be required. The Court will defer ruling on the motion at this time and will give the parties an opportunity to confer in an attempt to reach an agreement on a plan and if necessary to engage in discovery. If a hearing is necessary, it is hereby set to commence on December 14, 1987 at 9:00 a.m. In addition, KCMSD had also moved the Court for funding of its projected operating and desegregation budget deficits through 1987–88. The Court will deny the specific relief requested by the KCMSD but will provide KCMSD with additional resources to fund the share of its known and projected costs of the desegregation plan through 1992. Finally, AFT 691's motion for alternate funding relief regarding KCMSD teacher salaries will be denied as a specific part of this remedial order as the Court is of the opinion that any salary increases should be left to the discretion of the school board.

Before addressing KCMSD's request for the Court's approval of its long-range capital improvement plan, a brief review of the capital improvements previously ordered by the Court is in order. In its original remedy order of June 14, 1985, the Court approved $37,000,000 to be applied toward the most critical capital improvement needs of the KCMSD and reserved judgment as to whether additional capital improvements would be needed. *Jenkins v. State of Missouri,* 639 F.Supp. 19, 41 (W.D.Mo.1985). On June 16, 1986, the Court authorized an additional $12,877,330 in capital improvement expenditures for the six schools that became magnets in 1986–87 under the desegregation plan. *Jenkins,* 639 F.Supp. at 53. At that time the Court also ordered the KCMSD to submit a long-range capital improvement plan by January 5, 1987. *Id.*

Next, the Court approved $52,858,301 for capital improvements to eleven KCMSD schools that are to become magnets in the fall of 1987 under the court-ordered long-range magnet school plan. Order of No-

vember 12, 1986 at p. 5. Most recently, the Court approved $7,376,135 for the purchase and renovation of the Jewish Community Center for use as a temporary performing arts middle school magnet in 1987–88. Order of April 29, 1987 at p. 3.

Turning to the matter presently before the Court, the KCMSD has submitted a $265,000,000 long-range capital improvement plan calling for the renovation and construction of approximately 72 schools and six other facilities through the fall of 1996. The Desegregation Monitoring Committee unanimously approved the plan on February 2, 1987. The plaintiffs and AFT 691 are generally in favor of KCMSD's plan. On the contrary, the State strongly opposes the plan and has submitted an alternate proposal calling for approximately $61,000,000 in renovations to existing KCMSD schools.

The present conditions of the KCMSD schools have been improved by the $37,-000,000 in capital improvements undertaken pursuant to the Court's order of June 14, 1985 (testimony of Dr. R. Hunter, KCMSD Exh. 7). This work has primarily been on the exteriors of the school buildings and the surrounding playgrounds which has resulted in making them weatherproof and thus preventing further deterioration. The improved exterior appearance of these schools serves as an increased incentive for parents to enroll their children in the KCMSD. However, the overall condition of the KCMSD school buildings, particularly the interiors, is generally depressing and thus adversely affects the learning environment and continues to discourage parents who might otherwise enroll their children in the KCMSD (testimony of Dr. Hunter, C. Eppes, D. Osbourn, KCMSD Exh. 6).

The KCMSD facilities still have numerous health and safety hazards, educational environment hazards, functional impairments, and appearance impairments (testimony of Dr. Hunter, KCMSD Exh. 6). The specific problems include: inadequate lighting; peeling paint and crumbling plaster on ceilings, walls and corridors; loose tiles, torn floor coverings; odors resulting from unventilated restrooms with rotted, corroded toilet fixtures; noisy classrooms due to lack of adequate accoustical treatment; lack of off street parking and bus loading for parents, teachers and students; lack of appropriate space for many cafeterias, libraries, and classrooms; faulty and antiquated heating and electrical systems; damaged and inoperable lockers; and inadequate fire safety systems (testimony of Dr. Hunter, C. Eppes, D. Osbourn, C. Des-Moineaux, KCMSD Exh. 6). The conditions at Paseo High School are such that even the principal stated that he would not send his own child to that facility (testimony of R. Meadows).

■ Unquestionably, the deterioration of the KCMSD facilities is due to deferred maintenance by the KCMSD. However, as the Court found in its order of November 12, 1986, the State of Missouri by its constitutional violations and subsequent failure to affirmatively act to remove the vestiges of the dual school system certainly contributed to an atmosphere which prevented the KCMSD from raising the funds to maintain its schools. Order at p. 4. Furthermore, the Court has the responsibility of providing the victims of unlawful segregation with the educational facilities that they have been unconstitutionally denied. Therefore, a long-range capital improvement plan aimed at eliminating the substandard conditions present in KCMSD schools is properly a desegregation expense and is crucial to the overall success of the desegregation plan.

### STATE'S CAPITAL IMPROVEMENT PROPOSAL

■ The State of Missouri has submitted a capital improvement plan to remedy what it perceives as the substandard conditions present in the KCMSD (State Exh. 8). The scope of the work contained in the State's plan is estimated to cost $61,074,565, approximately $200,000,000 less than the estimated cost of KCMSD's long-range capital improvement plan. For the following reasons, the Court finds that the State's proposal is unsatisfactory because it fails to

remedy the substandard conditions in the KCMSD schools.

First, the State failed to consider the criteria of suburban comparability in evaluating the capital improvements to be made to the KCMSD schools. The Court in its order of June 14, 1985 specifically stated that capital improvements needed to bring KCMSD's facilities to a point comparable with the facilities in the neighboring suburban districts should be reviewed. Notwithstanding, Dr. Robert Bartman, Acting Commissioner of Education for the State of Missouri, instructed its architect, David Pearce, to only estimate the capital improvements necessary to eliminate health and safety hazards and to provide a good learning environment. Mr. Pearce testified that he compiled his estimates before he visited any suburban schools.

Specifically, the State's proposal does include funds for work needed on the electrical, mechanical, and ventilating systems to meet code requirements. However, the State's proposal does not provide sufficient funds for the updating of those systems to insure that the equipment does not suffer frequent breakdowns (testimony of D. Osbourn, C. DesMoineaux). In addition, the State proposes to paint only those specific areas on walls and ceilings which are repaired (testimony of D. Pearce). With regard to floor coverings, the State proposes to replace only those tiles which are loose or damaged with a new tile of similar color and style. Likewise, only the sections of carpeting which are worn or torn would be replaced under the State's plan. This "patch and repair" approach proposed by the State would not achieve suburban comparability or the visual attractiveness sought by the Court as it would result in floor coverings with unsightly sections of mismatched carpeting and tile, and individual walls possessing different shades of paint.

The Court also questions whether the State has budgeted sufficient funds to perform the limited scope of work that it proposes. For example, the State budgeted only $5,000 for plastering at Paseo High School, unquestionably one of KCMSD's facilities most in need of renovation or reconstruction (testimony of Dr. Hunter, D. Pearce, D. Osbourn). KCMSD has budgeted approximately $211,000 for plastering and $230,000 for interior painting at the same institution.

Other deficiencies in the State's proposal are a lack of funds for accoustical treatment in classrooms, or for floor covering on the bare concrete floors found in many restrooms. Such covering would eliminate one of the primary causes of the stench in these toilet areas (testimony of D. Osbourn). Furthermore, the State's proposal only provides handicap access to one level of each KCMSD school, thereby restricting handicapped students' access to many of the facilities and special programs offered by the KCMSD (testimony of C. Eppes). The State does not provide any funds for locker repair despite testimony by its own architect that many of the lockers are damaged, rusted, and missing doors. The State's plan does not include funding to reconfigure spaces within the KCMSD schools to provide adequate classrooms, library, cafeteria, and administrative areas.

The Court also notes that the State failed to estimate the cost necessary to provide magnet facilities needed to implement the long-range magnet school plan approved by the Court on November 12, 1986. The State argues that the broad contours of the magnet relief ordered are uncertain at best and suggests that the Court "reserve judgment on magnet related projects to a time when the scope of the magnet relief is more certain." State's Alternative Proposals Concerning Remaining Capital Improvements Funding for KCMSD, 6/3/87 pp. 29–30. The Court is certainly not surprised by the State's "wait and see" position but finds that such an approach would seriously damage the prospects of true desegregation in the KCMSD. The magnet plan is working as evidenced by the large number of applications for the magnet programs from students new to the KCMSD, and this Court is committed to its full implementation and will order the construction of the magnet facilities as part of the long-range capital improvement plan.

In conclusion, if the KCMSD schools underwent the limited renovation proposed by the State, the schools would continue to be unattractive and substandard, and would certainly serve as a deterrent to parents considering enrolling their children in KCMSD schools. Therefore, the Court rejects the State's plan and will next consider the long-range plan submitted by the KCMSD.

## KCMSD'S LONG-RANGE CAPITAL IMPROVEMENT PLAN

The KCMSD has submitted for the Court's approval a long-range capital improvement plan which calls for the renovation of approximately 55 schools, the closure of 18 facilities, and the construction of 17 new schools by the fall of 1996. However, the KCMSD is presently seeking funding for only that portion of the plan which is scheduled for completion by the fall of 1990. KCMSD estimates the cost of these renovations and new facilities at $194,328,578.

■ The KCMSD employed three architectural firms to review all its school facilities and determine what work was necessary to renovate the buildings. These architects applied the criteria set forth by the Court in estimating the scope of the work required to remedy the deteriorating conditions that exist in the KCMSD as a result of unlawful segregation. The result of their evaluations are contained in the 1985 capital improvement study (KCMSD Exh. 23). These architects have amended these estimates to reflect work which has been completed, or will be completed pursuant to previous court orders and to reflect inflation (KCMSD Exhs. 13, 14, 15 and 18). These renovations will eliminate the existing health and safety hazards identified by the Court and will correct the conditions which impede the level of comfort needed for the creation of a good learning environment. Equally important, these renovations proposed by the KCMSD, unlike those contained in the State's plan, will make the KCMSD visually attractive and reasonably comparable to the suburban Kansas City, Missouri schools (testimony of Dr. Hunter, D. Osbourn, C. Eppes). The remedy proposed by the KCMSD is not a "patch and repair" approach, but rather a comprehensive plan to restore KCMSD school facilities to an environment in which children can learn. The Court finds that the capital improvements proposed by the KCMSD to eliminate health and safety hazards and to improve the visual attractiveness and comfort level of the KCMSD schools are necessary and that their costs are reasonable.

The remaining portions of KCMSD's long-range capital improvement plan primarily consist of the expansion of existing facilities and the construction of new facilities. Before addressing these specific proposals, the Court must first review the enrollment projections on which KCMSD's long-range capital improvement plan is based.

■ The Court acknowledges that it is very difficult to predict what the enrollment will be in the KCMSD over the next ten years. Student enrollment in the KCMSD declined from 70,756 students in 1970–71 to 39,078 students in 1980–81 (KCMSD Exh. 19). Enrollment has continued to decline since 1980–81 but at a lesser rate with signs of a leveling off. If approved, the KCMSD long-range capital improvement plan will produce capacity for 44,890 by 1995, with a capacity of 22,183 in the elementary schools, 10,499 in the middle schools, and 12,210 in the high schools (testimony of Dr. Hunter, KCMSD Exhs. 13, 14 and 15). This plan provides capacity for an enrollment greater than the enrollments projected by the State of Missouri and the KCMSD using the cohort survival method which is based on the presumption that past enrollment trends will continue (State Exh. 19, KCMSD Exh. 24 at Tab A, Appendix 1, Table 26). However, the Court finds that the long-range capital improvement plan should not be based upon this presumption because it is very likely that enrollment in the KCMSD will increase due to the court-ordered upgrading of the regular school curriculum, the implementation of the long-range magnet school plan, and the improvements in capital facilities which

have been completed and which will be made as a result of this order.

Because of the inadequacy of the cohort survival enrollment projection, Dr. Hunter, the educational expert who developed the long-range capital improvement plan, requested the Mid-America Regional Council to estimate the future enrollment of the KCMSD using a "capture rate" analysis. The capture rate is simply the percentage of students who live in the KCMSD who actually attend KCMSD schools. The study concluded that if the capture rate attained by the KCMSD in 1970 were reachieved in 1995, the student population would total 47,898 (testimony of Dr. Hunter, KCMSD Exh. 24 at Tab A, KCMSD Exh. 19). The Court finds that this estimate is more accurate than that calculated using the cohort survival method and yet KCMSD's plan is conservative because it does not provide for all the capacity necessary to accommodate a 1995 enrollment based on the 1970 capture rate. Therefore, the Court finds that KCMSD's long-range capital improvement plan is based upon appropriate enrollment projections and will now address the expansions and new construction proposed in the plan.

■ KCMSD's proposal provides funds for the expansion of certain classrooms, learning resource centers, cafeterias, art and music rooms, and administrative areas. Dr. Hunter testified that these facilities were deficient in size and prepared specifications for standard facilities needed to house adequate educational programs (KCMSD Exhs. 2, 3 and 4). His recommendations are comparable to those made by the Missouri State Department of Elementary and Secondary Education (KCMSD Exh. 11). Furthermore, Dr. Hunter's recommendations were made only after he had visited each of the KCMSD schools and eleven of the suburban schools (testimony of Dr. Hunter). The Court finds that the expansion of these facilities is necessary to provide a good learning environment and that the costs of such expenditures are reasonable.

■ KCMSD's proposal also includes funding for the construction of specialized facilities needed for implementation of the long-range magnet school plan approved by the Court. Phale Hale, a magnet school expert who coauthored the long-range magnet school plan approved by the Court, developed the facilities requirements for the long-range magnet school plan (KCMSD Exh. 5). These improvements are in addition to the approximately $53,000,-000 in capital improvements approved by the Court for the schools scheduled to become magnets in 1987. The magnet school plan is crucial to the success of the Court's total desegregation plan and the KCMSD cannot effectively implement the magnet programs without special facilities. The question before the Court is whether the improvements proposed are necessary to carry out the magnet programs approved by the Court.

One example is the Kansas City Technical Center, a four year vocational and technical magnet high school which is designed to prepare students upon graduation to either enter college, obtain entry level employment, or both. This magnet will offer programs ranging from heating and air conditioning to cosmetology to robotics. Consequently, these programs require special equipment and spacious work areas in which to instruct the students. The estimated cost for Kansas City Tech is $13,-278,603, which also includes funds for an expanded cafeteria, athletic facilities, and other facilities essential for the operation of a regular high school. The Court finds that all of the facilities proposed for the Kansas City Technical Center and all the special facilities requested for the other magnet programs are necessary to implement the long-range plan and that the estimated costs of these additional facilities are reasonable.

The long-range capital improvement plan also calls for the closure of eighteen KCMSD school facilities, 15 of which are currently operating as schools, and the construction of seventeen new schools, the last of which is a new middle school III scheduled for completion by the fall of 1993. The criteria used by the KCMSD to determine whether to renovate a school or build

a new facility was that buildings with renovation costs of $45 per square foot or more should be replaced (testimony of Dr. Hunter). The estimated cost of construction of the new schools ranges from $61.80 per square foot for middle schools I and III to $95.70 per square foot for the new Attucks Elementary School. Both the architects for the KCMSD and the State of Missouri stated that buildings with renovation costs of more than 50% of the cost of new construction are candidates for replacement (testimony of D. Osbourn, D. Pearce).

The most expensive of the proposed new constructions is Paseo High School at an estimated cost of $13,991,375, excluding architectural fees and inflation (KCMSD Exh. 15). The renovation of the existing facility which includes the addition of special magnet facilities would cost an estimated $8,033,100 (KCMSD Exh. 15). The Court finds that it would be imprudent to renovate Paseo High School rather than build a new facility because both the architects for the KCMSD and the State stated that Paseo High School is near the end of its useful life (testimony of D. Osbourn, D. Pearce). In addition, it is essential to the success of the magnet school plan that Paseo High School be one of the most attractive magnet programs because it is located in an area which is considered difficult to desegregate (testimony of Dr. Hunter). Therefore, the Court approves the construction of a new Paseo High School and the sixteen other new facilities proposed in the long-range capital improvement plan. However, the Court approves funding of only those facilities scheduled for completion by the fall of 1990, and reserves final judgment on the remaining schools until a time when more current enrollment figures are available.

The Court also approves the closure of Attucks, Faxon, Gladstone, Greenwood, Holmes, Knots, Kumpf, Manchester, Pershing, Pitcher, Switser, Thatcher, Willard, Woodland, Linwood West, and Norman Elementary Schools. The Court will not establish closing dates at this time so that these schools may be used to house students while other facilities are being renovated or constructed under the long-range capital improvement plan.

■ KCMSD's plan also requests funding for the renovation of East Stadium, Southeast High Stadium and Arena, the Norman Administrative Center, Linwood, and Linwood West. The Court finds that these additional facilities are in need of renovation but finds that the 8% amount allotted for architectural and engineering fees, which is included in the total cost of their renovation, is excessive. The State's expert David Pearce testified that 6% is a customary architectural fee in school capital improvement projects. Therefore, the Court approves these renovations but in a lesser amount to reflect architectural fees of 6%. Similarly, the Court will only approve a 6% architectural fee for all the other renovations and new constructions approved by the Court as part of the long-range capital improvement plan.

In addition, the KCMSD did not present any evidence regarding its request for a furniture budget for schools to be renovated under the plan and for schools previously renovated. The Court simply cannot consider such requests without knowing the quantity and quality of the furniture that is presently available in the KCMSD.

The KCMSD has adjusted the estimated costs of its long-range capital improvement plan by 5% a year to reflect inflation. The Court finds that this percentage is reasonable and will apply it to the estimated costs of the plan as modified by this Court.

■ Finally, the KCMSD has also requested funding for a project management team which would oversee the implementation of the long-range capital improvement plan. The team, a joint venture of J.E. Dunn Construction Company and the Allied Companies, would utilize the architects, engineers and other specialists from these four firms in acting as KCMSD's agent in supervising the architects and contractors who are hired to perform the renovations and new construction set forth in the plan. In addition, the project management team will provide other professional services including project scheduling, cost control, quality control, and site selection (testimo-

ny of Robert Barrett, KCMSD Exh. 22). The KCMSD has negotiated a contract, pending this Court's approval, with this project management team which provides that the team will receive compensation of $12,750,000 or 4% of the total capital improvements program expenditures for phases IV through VIII of the capital improvements program, whichever is less (KCMSD Exh. 22).

The Court finds that it is not feasible for the KCMSD to manage internally a program of the magnitude of the proposed long-range capital improvement plan. It is essential that the renovations and construction are completed on schedule and at costs within the budget approved by the Court. The Court finds that the project management team is necessary to effectively implement the plan and the Court is confident that the team will effect cost savings considerably more than the cost of the project management team. Accordingly, the Court approves the contract entered into between the KCMSD and the project management team (KCMSD Exh. 22) but approves the budget for the supervision and planning for only the first three years of the long-range capital improvement plan.

For the reasons set forth, the Court approves KCMSD's long-range capital improvement plan as modified in this order and orders the funding of those projects scheduled for completion by the fall of 1990 in accordance with Attachment A.

The plan approved by the Court does not include costs of acquiring or preparing sites for the new facilities. In addition, the Court acknowledges that the KCMSD will incur additional costs in relocating students while the approved capital improvements are completed. Accordingly, KCMSD is directed to submit these costs to the Court for approval and funding as soon as they become known.

■ The total amount of funding approved by the Court for those projects scheduled for completion by the fall of 1990 is $187,450,334. The State of Missouri and the KCMSD are jointly and severally liable for this amount with contribution between the two constitutional violators to be $93,-725,167 each.

These capital improvements will have a service life of at least 30 to 50 years and the KCMSD will continue to benefit from them long after the hopeful success of the desegregation plan has been realized. For this reason the Court departs from the 3 to 1 apportionment generally set forth in previous remedial orders.

## KCMSD'S 1987–88 MAGNET SCHOOL TRANSPORTATION PLAN

Also before the Court is KCMSD's motion for approval and funding of the 1987–88 incremental transportation costs attributable to the long-range magnet school plan ordered by the Court. KCMSD states that in 1986–87 it expended $1.4 Million to transport students to the three magnet programs at the Lincoln College Preparatory, the Southwest Cluster, and the Westport Community Applied Learning Magnet. KCMSD projects that the implementation of the 13 new magnet programs in 1987–88 will increase the total transportation costs for the magnet schools to $4,490,836. However, approximately $2.2 Million of this amount represents the cost that would have been incurred in operating traditional transportation routes at these schools even if there had been no magnet school program. Thus, KCMSD requests the Court to order the State to pay 75% of the remaining $2,294,075 cost of transportation required by the magnet program.

In response, the State requests that the plan be denied in its entirety or in the alternative that a hearing should be held at a future date to allow adequate discovery as to how and by whom the plan was developed and whether it is adequate and cost effective. As stated earlier, the parties should confer and see if they can reach an agreement on a plan. If needed, the parties may engage in discovery and if necessary a hearing will be held during the week of December 14, 1987. The KCMSD may implement the plan if it desires with the understanding that the Court has not approved the plan or ordered the State to fund any portion of the plan over and

above the regular State aid under the standard formula.

### KCMSD'S MOTION FOR FUNDING RELIEF

In its order of July 6, 1987, the Court deferred ruling on KCMSD's motion for funding relief until after the Court had ruled on the long-range capital improvement plan. The Court did so because it wanted an accurate estimate of not only KCMSD's deficit through fiscal year 1987–88, but also KCMSD's financial obligations under the overall desegregation plan through 1991–92.

Before setting forth the financial obligations of the KCMSD under the remedial plan, the Court must correct its order of July 6, 1987 which approved the year 3 desegregation budget. The Court, pursuant to the request of the KCMSD, included the 1987–88 implementation cost of the long-range magnet school plan in the 1987–88 desegregation budget. The total implementation cost for the 1987–88 magnets is $17,137,993, of which $13,946,729 was previously approved by the Court in its order of November 12, 1986. In that previous order, the Court found the State of Missouri and the KCMSD jointly and severally liable for $8,908,406 of this amount, with the State solely liable for $5,038,323. This apportionment of liability for the $13,946,-729 remains unchanged as will the Court's apportionment for the remaining implementation costs approved in the November 12, 1986 order. While the Court's apportionment for the KCMSD is more than 25% in year 1987–88 under the November 12, 1986 order, the percentage of liability for the implementation costs decreases to approximately 13% in 1991–92 under the plan. The KCMSD's total portion of the implementation costs and capital expenditures for the long-range magnet school plan approved in the November 12, 1986 order is approximately 25%, and thus is consistent with the Court's previous orders.

Therefore, in determining KCMSD's contribution to the year 3 desegregation budget, the Court mistakenly applied 25% to the entire 1987–88 implementation cost of the long-range magnets when the liability for $13,946,729 of that amount had already been apportioned. The 25% should only have been applied to the $3,191,264 in additional magnet base costs that the Court approved in its July 6, 1987 order. Therefore, the Court corrects page 12 of the order to reflect the following apportionment:

1987–88 Desegregation Budget

| | Total | KCMSD'S Contribution | State's Contribution |
|---|---|---|---|
| Public Information | 30,000.00 | 7,500.00 | 22,500.00 |
| Desegregation Monitoring Office | – 0 – | | |
| Program Evaluation | – 0 – | | |
| Desegregation Monitoring Committee | 256,228.00 | 64,057.00 | 192,171.00 |
| Effective Schools | 6,555,000.00 | 1,638,750.00 | 4,916,250.00 |
| Reduction in Class Sizes Total | 8,450,135.00 | 2,112,534.00 | 6,337,601.00 |
| Summer School | 1,295,764.00 | 323,941.00 | 971,823.00 |
| Full Day Kindergarten | 1,826,964.00 | 456,741.00 | 1,370,223.00 |
| Before and After School Tutoring | 233,759.00 | 58,440.00 | 175,319.00 |
| Early Childhood Education | 3,102,178.00 | 775,545.00 | 2,326,633.00 |
| Long-Range Magnet School Plans | 17,137,993.00 | 5,252,019.00 | 11,885,974.00 |
| 1986–87 Magnets | 12,257,529.00 | 3,064,383.00 | 9,193,147.00 |
| AAA Achievement | 6,340,614.00 | 1,585,154.00 | 4,755,460.00 |
| SWAS, DRP and STEPS | – 0 – | | |
| Facilities Improvements (interest) | 353,061.00 | 88,265.00 | 264,796.00 |
| Totals | 57,839,225.00 | 15,427,329.00 | 42,411,897.00 |

In calculating the financial obligations of the KCMSD under the Court's overall plan for which the district lacks funding, the Court finds that the KCMSD suffered a deficit of $1,092,365 in 1986–87 in implementing the long-range magnet school plan based on its obligation of $4,158,136 and expenditures of $3,065,771. In addition, the Court approved a total of $60,234,436 in capital improvements for the long-range magnet plan in its orders of November 12, 1986 and April 29, 1987, with KCMSD's share set at $30,117,218. KCMSD has currently expended $3,027,413 for these improvements in 1986–87 but is without revenues to fund the balance of its share of these capital improvements, or $27,089,805.

For fiscal year 1987–88, KCMSD projects an operating budget of $121,342,253 and total revenues of $110,558,418, creating a deficit of $10,783,835. Included in the operating budget is approximately $7.15 Million for additional teachers and for salary increases for present teachers, $2,240,000 for facilities maintenance, and $869,189 for special education students. The AFT 691 has moved the Court to order a teacher's salary schedule larger than that included in the KCMSD 1987–88 operating budget.

▪ The Court finds that the KCMSD has an obligation not only to eliminate the effects of unlawful segregation but also to insure that there is no diminution in the quality of its regular academic program. *Bradley v. Milliken,* 540 F.2d 229, 245 (6th Cir.1976), *aff'd,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), *citing Hart v. Community School of Brooklyn,* 383 F.Supp. 699, 741 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir.1975). Therefore, it is essential that the KCMSD have sufficient revenues to fund an operating budget which can provide quality education, including a high quality faculty. The Court is quite aware that the KCMSD's teacher salary position, in comparison with the surrounding school districts, has deteriorated significantly because of KCMSD's failure to obtain passage of a tax levy to fund teacher salary raises. Consequently, KCMSD's ability to attract new teachers and retain present teachers has been restricted. While the revised salary schedule proposed by the KCMSD would not equal those in suburban districts, it will certainly make the KCMSD more attractive to new teachers and more pleasing to its present teachers. As stated at the beginning of the order, the Court will not order either of the salary proposals submitted by the KCMSD and AFT 691 because this decision properly lies within the discretion of the school board. However, the Court will provide KCMSD with revenues of $7.147 Million per fiscal year through 1991–92 to fund teacher salary increases, and revenues of $3,109,189 per year to fund the costs of facilities maintenance and special education students.

The KCMSD is also without resources to finance its portion of the 1987–88 desegregation budget, $15,427,329, which includes the 1987–88 implementation cost of the long-range magnet school plan. In addition, the KCMSD is without the funds to pay its proposed share of the 1987–88 transportation costs of the magnet plan, estimated by it to be $573,518. KCMSD is also obligated in 1987–88 to fund $6,069,801 in capital improvements pursuant to the long-range capital improvement plan approved by the Court. Finally, the Court estimates that site selection and student relocation costs associated with the long-range capital improvement plan will be approximately $4 Million per year, with KCMSD's portion to be $2 Million per year (affidavit of Roger Gaunt). In summation, the KCMSD has financial obligations under the Court's overall desegregation plan for 1986–87 and 1987–88 of $62,509,653 for which it lacks resources to fund.

In fiscal year 1988–89, the KCMSD is obligated to fund an estimated $4,454,203 for implementation of the long-range magnet school plan and $27,399,873 in capital improvements pursuant to the long-range capital improvement plan. The Court projects that KCMSD's portion of the magnet school transportation costs for each of the next four fiscal years will be $573,518. The Court also projects that the KCMSD will have an operating budget deficit of $10,256,835 for fiscal years 1988–89 through 1991–92 due to expenditures needed for teacher salary increases, facilities

maintenance, and special education students. In addition, the Court estimates that the 1988–89, 1989–90, 1990–91, and 1991–92 desegregation budgets at approximately $44,000,000 per fiscal year, excluding the long-range magnet costs approved by the Court in its November 12, 1986 order, because of the continuing cost of the remedial programs previously ordered by the Court. Therefore, the Court finds that the KCMSD will experience a deficit of approximately $11,000,000, or 25% of the desegregation budget, in each of those fiscal years. In summation, the Court projects a total deficit of $53,684,429 for the KCMSD for 1988–89.

Similarly in 1989–90, the Court projects that the KCMSD will experience a deficit of $5,027,721 in long-range magnet costs, $63,555,647 in capital improvement costs, $10,256,835 in operating budget, and $11,-000,000 in desegregation budget, totaling $89,840,203. Using the same method of calculation, the projected deficits for years 1990–91, and 1991–92 are $42,543,837 and $33,823,793 respectively, bringing the total deficit to $282,401,915. A summary of the KCMSD's known and projected obligations through 1991–92 under the Court's desegregation plan is set forth in Attachment B.

In its motion for funding relief, the KCMSD requested the Court to enjoin the rollback in the real estate tax levy otherwise required under Proposition C (R.S.Mo. §§ 163.050 and 164.013). The KCMSD also requested the Court to order the State of Missouri to advance to it funds for its desegregation and operating expenses that it is unable to fund. The KCMSD would then repay the State when resources were available.

The Court will not require the State of Missouri to fund any of KCMSD's financial obligations under the court-ordered desegregation programs. However, the United States Court of Appeals for the Eighth Circuit stated clearly that the desegregation remedy ordered by this Court shall be fully funded. *Jenkins v. State of Missouri,* 807 F.2d 657, 686 (8th Cir.1986), and has discussed in detail the procedure the district court is to follow in achieving this goal. *Liddell v. State of Missouri,* 731 F.2d 1294, 1319–23 (8th Cir.1984).

The record clearly shows that the KCMSD is unable with its present resources to raise revenues to fund its share of the costs assessed under the desegregation orders. The KCMSD has exhausted all available means of raising additional revenue, including presenting a bond issue in 1987 and tax levy increase proposals to the voters in four separate elections in 1986 and 1987. The KCMSD has not had a bond passage or a levy increase since 1969. As a result, its physical facilities have literally rotted.

Because of KCMSD's inability to raise additional funds under the present system, the Court encouraged the Missouri General Assembly to "explore the possibility of enacting legislation that would permit a district involved in a desegregation plan more versatility than it presently has to raise funds with which to support the program." November 12, 1986 Order at p. 7. Such legislation was introduced but was received unfavorably and ultimately failed. In addition, the State of Missouri and the KCMSD have been unable to agree on an alternate method of raising KCMSD's share of the desegregation costs. Therefore, the Court has explored all the alternatives set forth by the Eighth Circuit and is left with no choice but to exercise its broad equitable powers and enter a judgment that will enable the KCMSD to raise its share of the cost of the plan and therefore insure that the constitutional violations committed by the KCMSD and the State of Missouri are cured.

The United States Court of Appeals for the Eighth Circuit has stated that such relief may only be granted after the Court has conducted an evidentiary hearing. *Liddell v. State of Missouri,* 731 F.2d 1294, 1323 (8th Cir.1984). However, the plaintiffs, the KCMSD, and the State of Missouri have stated that they do not request an evidentiary hearing on this issue, and consent to the Court's entry of a judgment based on the record developed in this case.

A district court's broad equitable power to remedy the evils of segregation

includes the power to order tax increases and bond issuances. *Liddell v. State of Missouri*, 731 F.2d at 1322. The United States Supreme Court has stated that a tax may be increased if "necessary to raise funds adequate to ... operate and maintain without racial discrimination a public school system." *Griffin v. School Board of Prince Edward County*, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964).

A studied estimate of the additional revenues needed by the KCMSD to meet its share of the desegregation costs during the next five years reveals the sum of approximately $150,000,000 for capital improvements and $135,000,000 for other desegregation costs.

In its order of June 14, 1985, this Court stated that it was reluctant to take any action to increase taxes. The Court now affirms the statement made in its order of August 25, 1986 that it is not insensitive to the fact that those patrons of the KCMSD who voted in previous elections have refused to approve a tax levy increase and a bond issue. However, a majority has no right to deny others the constitutional guarantees to which they are entitled. This Court, having found that vestiges of unconstitutional discrimination still exist in the KCMSD, is not so callous as to accept the proposition that it is helpless to enforce a remedy to correct the past violations. Failure of the KCMSD to come forward with its share of funds to implement the remedial plan would certainly operate to hinder vindication of federal constitutional guarantees to which the school children in the KCMSD are entitled. This Court cannot shrink its sworn duty to uphold the Constitution of the United States (p. 4). The Court must weigh the constitutional rights of the taxpayers against the constitutional rights of plaintiff students in this case. The Court is of the opinion that the balance is clearly in favor of the students who are helpless without the aid of this Court.

 The Court is of the firm conclusion that it has no alternative but to impose tax measures which will enable KCMSD to meet its share of the cost of the desegregation plan. At the Court's request the parties have submitted estimates on revenues which would be generated through various tax measures.

The plaintiffs have moved the Court to require KCMSD to issue $144,175,000 in general obligation bonds, to add a $1.73 property tax levy in the KCMSD, and to impose a ½% sales tax effective January 1, 1989 within the KCMSD to permit KCMSD to fund its share of the costs of the desegregation orders.

During the hearing on the liability issue in this case there was an abundance of evidence that many residents of the KCMSD left the district and moved to the suburbs because of the district's efforts to integrate its schools but continue to be employed in the district. After careful consideration, the Court has determined that it would be equitable to involve these people in a plan to help defray the district's desegregation expense.

The Court will impose a 1.5% increase as a surcharge on the Missouri State Income Tax (raising the present rate on individuals from 6% to 7.5%) on residents and nonresidents of the KCMSD, including business associations, partnerships and corporations who earn salaries, wages, commissions and all other compensation and income subject to the Missouri State Income Tax for work done, services rendered and business or other activities conducted within the KCMSD. This surcharge shall become effective for all income earned after September 25, 1987. All employers and persons presently legally responsible for withholding the Missouri State Income Tax shall have the same responsibility for withholding the 1.5% increase. The State through its Department of Revenue shall collect the increased tax and remit it to the KCMSD within thirty days after its receipt of same. KCMSD shall promptly prepare and publish a legal notice of this income tax increase (surcharge) giving notice to all employers within the district and to all persons and entities who receive an income for activities performed within the district.

Revenue generated by the income tax surcharge shall be used to retire capital improvement bonds which are herein authorized. It is anticipated that the surcharge will create sufficient revenue for the KCMSD to meet its portion of the cost of the capital improvement plan. The surcharge shall remain in effect until such time as the bonds are retired or until other provisions are adopted to insure their retirement.

The KCMSD presently has a tax levy of $2.05 per $100.00 assessed valuation. This is much less than the tax levy of any neighboring school district. In order to fund the other desegregation costs other than capital improvements for which it is obligated the district needs approximately $27,000,000 additional per year through the 1991–92 school year. A property tax increase of $1.95 per $100 assessed valuation would generate about $27,000,000 annually. Therefore the Court will order the property tax levy to be increased to $4.00 per $100 assessed valuation through the 1991–92 fiscal year.

The KCMSD is directed to issue capital improvement bonds in the total amount of $150,000,000 to be retired within 20 years from the date of issue. The board is authorized to issue credit enhanced leasehold revenue bonds and general obligation bonds in such proportion as the school board, in its discretion, determines to be most advantageous to the district.

In accordance with the foregoing memorandum, it is

ORDERED that the motion of the KCMSD for the approval of its capital improvement plan is approved as modified herein; and it is further

ORDERED that the motion of the KCMSD for approval of its student transportation plan for the long-range magnet school plan is deferred and if a hearing is necessary on the plan it is set to commence on Monday, December 14, 1987 at 9:00 a.m.; and it is further

ORDERED that the motion of AFT 691 for alternate funding relief regarding the salaries of the KCMSD teachers is denied; and it is further

ORDERED that the motion of KCMSD for funding relief is granted in part in that it is ordered that in order to fund the obligation of the KCMSD for the desegregation program, a surtax of 1.5% is added to the Missouri State Income Tax for all persons and entities receiving income for work done, services rendered, and income received from activities within the KCMSD and the tax levy for the KCMSD is raised to $4.00 per $100 assessed valuation; and it is further

ORDERED that said increased revenue shall be applied to satisfy the obligations of the KCMSD as set forth in this memorandum.

### ATTACHMENT A

#### Long-Range Capital Improvement Plan Funding Order (1987–90)

| Construction Phase (Date of Completion) | Work Required | Cost |
|---|---|---|
| Phase V | | |
| Southeast Annex (Fall, 1988) | R | $ 888,087 |
| Longfellow (Fall, 1988) | MI | 352,110 |
| Melcher (Fall, 1988) | MI | 1,393,680 |
| Meservey (Fall, 1988) | MI | 395,600 |
| N. Rock Creek/Korte (Fall, 1988) | MI | 1,751,403 |
| | | 154,011 |
| Phillips (Fall, 1988) | MI | 445,200 |
| Southwest Senior High (Fall, 1989) | MI–R | 8,882,817 |
| New Faxon Elementary (Fall, 1989) | NC | 3,946,460 |

| Construction Phase (Date of Completion) | Work Required | Cost |
|---|---|---|
| **Phase VI** | | |
| New Knotts Elementary (Fall, 1989) | NC | 4,020,620 |
| New Attucks Elementary (Fall, 1989) | NC | 4,031,300 |
| King Middle (Fall, 1989) | MI–R | 828,639 |
| New Pitcher Elementary (Fall, 1988) | NC | 5,527,010 |
| New Northeast Elementary (Fall, 1989) | NC | 4,580,000 |
| New Southeast I Elementary (Fall, 1989) | NC | 5,621,000 |
| Nowlin Middle (Fall, 1989) | MI | 2,484,290 |
| Paseo High (Fall, 1990) | NC | 13,991,375 |
| Three Trails (Fall, 1989) | MI | 1,119,773 |
| K.C. Tech (Fall, 1990) | MI–R | 13,278,603 |
| Troost (Fall, 1989) | MI–R | 2,283,073 |
| Wheatley (Fall, 1989) | MI | 1,265,154 |
| Middle School I (Spring, 1990) | | 6,705,000 |
| Garfield (Fall, 1989) | MI–R | 3,899,110 |
| Weeks (Fall, 1989) | MI–R | 645,300 |
| **Phase VII** | | |
| New Southeast II Elementary (Fall, 1990) | NC | 4,545,000 |
| New Southeast III Elementary (Fall, 1990) | NC | 5,530,500 |
| New Elementary I (Fall, 1990) | NC | 4,427,000 |
| New Elementary II (Fall, 1990) | NC | 3,870,000 |
| New Elementary III (Fall, 1990) | NC | 3,870,000 |
| East High (Fall, 1990) | MI–R | 6,706,704 |
| Northeast Middle (Fall, 1990) | MI–R | 6,899,162 |
| Richardson (Fall, 1990) | MI–R | 1,250,645 |
| Southeast High (Fall, 1990) | MI–R | 6,128,250 |
| Van Horn High (Fall, 1990) | MI–R | 5,868,580 |
| Westport Middle (Fall, 1990) | MI–R | 4,766,303 |
| Westport High (Fall, 1990) | MI–R | 6,759,951 |
| Meservey (Fall, 1990) | R | 732,103 |
| **Phase VII (other facilities)** | | |
| East Stadium (Fall, 1990) | R | 401,020 |
| Southeast High — Stadium and Arena (Fall, 1990) | R | 438,320 |
| Linwood (Fall, 1990) | R | 792,984 |
| Linwood West (Office Space) (Fall, 1990) | R | 970,122 |
| Norman Administrative Center (Fall, 1990) | R | 3,062,057 |

| | |
|---|---|
| $155,468,316 | Total Cost |
| 9,328,098 | Architect Fees |
| 21,254,230 | Inflation |
| 1,399,690 | Construction Planning 1987–90 |
| $187,450,334 | Total Projected Cost |

Key: R – Renovation
MI – Magnet Improvement
NC – New Construction

ATTACHMENT B

| | 1986–88 | 1988–89 | 1989–90 | 1990–91 | 1991–92 | TOTAL 1986–92 |
|---|---|---|---|---|---|---|
| CAPITAL IMPROVEMENTS | 33,159,606 | 25,399,873 | 61,555,647 | 14,259,281 | 5,539,237 | 139,913,644 |
| Projected Costs of Site Selection/Student Relocation associated with the Long-Range Capital Plan | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 10,000,000 |
| Subtotal | 35,159,606 | 27,399,873 | 63,555,647 | 16,259,281 | 7,539,237 | 149,913,644 |
| DESEGREGATION EXPENSES | | | | | | |
| Desegregation Budget Deficit | 16,519,694 | 11,000,000 | 11,000,000 | 11,000,000 | 11,000,000 | 60,519,694 |
| Projected Magnet Transportation Costs | 573,518 | 573,518 | 573,518 | 573,518 | 573,518 | 2,867,590 |
| Magnet Implementation Costs | included in Deseg. Bud. Deficit | 4,454,203 | 4,454,203 | 4,454,203 | 4,454,203 | 17,816,812 |
| Subtotal | 17,093,212 | 16,027,721 | 16,027,721 | 16,027,721 | 16,027,721 | 81,204,096 |
| OPERATING BUDGET DEFICIT | | | | | | |
| Teacher Salary Package | 7,147,646 | 7,147,646 | 7,147,646 | 7,147,646 | 7,147,646 | 35,738,230 |
| Maintenance | 2,240,000 | 2,240,000 | 2,240,000 | 2,240,000 | 2,240,000 | 11,200,000 |
| Special Education Students | 869,189 | 869,189 | 869,189 | 869,189 | 869,189 | 4,345,945 |
| Subtotal | 10,256,835 | 10,256,835 | 10,256,835 | 10,256,835 | 10,256,835 | 51,284,175 |
| TOTAL | 62,509,653 | 53,684,429 | 89,840,203 | 42,543,837 | 33,823,793 | 282,401,915 |