949 F.2d 1052
 71 Ed. Law Rep. 409
 Kalima JENKINS, by her next friend, Kamau AGYEI; Carolyn
Dawson, by her next friend Richard Dawson; Tufanza A. Byrd,
by her next friend Teresa Byrd; Derek A. Dydell, by his
next friend Maurice Dydell; Terrance Cason, by his next
friend Antoria Cason; Jonathan Wiggins, by his next friend
Rosemary Jacobs Love; Kirk Allan Ward, by his next friend
Mary Ward; Robert M. Hall, by his next friend Denise Hall;
Dwayne A. Turrentine, by his next friend Shelia Turrentine;
Gregory A. Pugh, by his next friend David Winters; on
behalf of themselves and all others similarly situated;
Plaintiffs-Appellees,
American Federation of Teachers, Local 691, Intervenor-Appellee,
v.
STATE OF MISSOURI; John Ashcroft, Governor of the State of
Missouri; Wendell Bailey, Treasurer of the State of
Missouri; Missouri State Board of Education; Roseann
Bentley, Member of the Missouri State Board of Education;
Raymond McCallister, Jr., Member of the Missouri State Board
of Education; Susan D. Finke, Member of the Missouri State
Board of Education; Thomas R. Davis, presiding President,
Member of the Missouri State Board of Education; Robert E.
Bartman, Commissioner of Education of the State of Missouri;
Gary D. Cunningham, Member of the Missouri State Board of
Education; Rebecca M. Cook, Member of the Missouri State
Board of Education; Sharon M. Williams, Member of the
Missouri State Board of Education; Defendants-Appellants
School District of Kansas City, Missouri; Walter L. Marks,
Superintendent thereof, Defendants-Appellees
 No. 91-3356.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 20, 1991.
Decided Nov. 27, 1991.
 
 Michael Fields, Jefferson City, Mo., argued (Bart A. Matanic, on the brief), for defendants-appellants.
 Allen Snyder, Washington, D.C., and Arthur Benson, Kansas City, Mo., argued (Michael Thompson and Shirley Ward Keeler, Kansas City, Mo., and David S. Tatel, Allen S. Snyder, Daniel B. Kohrman and Wilhelmina M. Wright, Washington, D.C., on brief), for plaintiffs-appellees.
 Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is an extremely narrow one, whether the State of Missouri may defer payments it concedes it owes for capital improvements in the Kansas City, Missouri, School District for the 1991-92 school year until after July 1, 1992. The State argues that after it spent $3.9 million during the 1991-92 school year, it had exceeded the $150,000,000 limit referred to in our earlier opinion in Jenkins v. Missouri, 855 F.2d 1295 (8th Cir.1988) (Jenkins II ), aff'd in part and rev'd in part, 495 U.S. 33, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990), and it made a budgeting decision that its expenditures should not exceed this amount. KCMSD argues that our language in Jenkins II was approximate only, and that later district court orders, particularly those dealing with land acquisition costs, have in effect increased the limit. We affirm the district court's[1] order that the State is responsible for the payments under regular drawdown[2] procedures during the remainder of the 1991-92 school year, but further order that the parties obtain interim financing so as to make unnecessary substantial cutbacks by the State in the remainder of the fiscal year.
 
 
 2
 The seeds of the controversy before us and the basis for the State's argument are contained in language in our Jenkins II opinion in which we stated:
 
 
 3
 From materials that have been filed with us concerning the financial needs of the KCMSD, it is apparent that the capital improvements plan that we affirm today does not cover all expenditures that may be necessary between now and the 1991-92 school year, specifically some $16 million for land acquisition and asbestos removal costs. We are informed by the post-argument filings that KCMSD's bond issue has been sold, and that the net proceeds are in the hands of the district. Presumably, these funds will produce substantial interest income before all will be expended in the renovation and construction program. The State is entitled to a determination of the extent of its liability through the 1991-92 fiscal year, and we conclude that the approximately $150,000,000 which is the State's share of capital improvements should be the limit of its contribution for capital expenditures for that period.
 
 
 4
 855 F.2d at 1306.
 
 
 5
 Following this decision, the district court has entered some twenty orders with respect to capital improvements--ordering funding for site acquisitions, furniture, construction, and other capital items. The State appealed only two of these orders. In Jenkins v. Missouri, 931 F.2d 470 (8th Cir.) (Jenkins IV ), cert. denied, --- U.S. ----, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991), we affirmed a district court order including asbestos abatement costs as capital expenses under the desegregation remedy, id. at 478-79, and approving a $8,231,565 increase in the Central High School construction budget. Id. at 481-83.[3]
 
 
 6
 In essence, the dispute between the parties is whether these increased amounts of expenditures for capital improvements are to be added to the $300 million referred to in Jenkins II, which KCMSD argues, or whether they must be included within that amount, which is the position of the State.
 
 
 7
 We issued Jenkins IV on April 22, 1991. Shortly thereafter, the chain of events leading to this controversy commenced. On May 14, 1991, the Missouri attorney general's office notified counsel for the KCMSD that this court limited the State's capital contributions to $150,000,000 in Jenkins II; that up to May 1, 1991, the State had made capital contributions of $147,866,767.04; and that with interest earnings, the State was required to pay only another $820,699.92. The attorney general's office advised that the State would deposit $820,699.92 in the capital account, and that this would be the last deposit until July 1, 1992. During the 1991-92 school year, the State made total contributions to the capital improvements fund of approximately $3.9 million.
 
 
 8
 The State's decision to terminate its payments was a budgeting decision. The Assistant Director for the Division of Budget and Planning in the Office of Administration for the State of Missouri, attached budget figures dated January 10, 1991, to an affidavit showing the capital account with the high figure of $60 million, a low of zero, and an estimate of $3.9 million for the 1991-92 school year. He explained in his affidavit that based on the limit set by this court: "I have budgeted only $3.9 million for capital [improvements] in Fiscal Year 1992."
 
 
 9
 After receiving the May 14, 1991, letter from the attorney general's office, KCMSD filed a motion for an expedited order requiring the State to make the necessary payments to fund the capital facilities approved by the district court. KCMSD requested an order prohibiting the State from unilaterally cutting off funds and requiring it to cooperate with the capital account drawdown process through the end of KCMSD's 1991-92 year. The district court granted KCMSD's motion on August 23, 1991. Jenkins v. Missouri, No. 77-0420-CV-W-4, slip op. at 3 (W.D.Mo. Aug. 23, 1991).[4] On October 16, 1991, the district court entered an order denying the State's motion to alter or amend the judgment and the State's request for a stay pending appeal. Jenkins v. Missouri, No. 77-0420-CV-W-4 slip op. at 2 (W.D.Mo. Oct. 16, 1991). On October 18, 1991, the State filed its notice of appeal and moved for a stay pending appeal. We expedited briefing and argument of the motion for stay pending appeal, but on the morning the case was to be heard, the parties reached an agreement making it unnecessary that we consider the stay motion. The parties requested that hearings on the merits be expedited, and we have now heard arguments.
 
 
 10
 The State argues before this court, as it did in the district court, that Jenkins II placed a specific limitation of both time and amount on the State's total capital contribution through the fiscal year 1992 of "approximately $150,000,000." The State further argues that no orders since Jenkins II have overruled the $150,000,000 limit, that the State has relied on the limit, and that a change in the State's expectations at this time would wreak havoc on the State's budget, requiring in addition to some $200 million in earlier budget cuts, an additional $34.5 million in cuts from state aid to school districts throughout the state, $17.9 million from college and university budgets, and cuts in health, family and child welfare programs and mental health programs. The State only argues that the language in Jenkins II entitles it to delay payment of its capital obligations beyond the $150,000,000 limit until the 1992-93 fiscal year. It states: "Acceptance of the State's position would not change ultimate responsibility for payment of capital obligations between the two paying parties in any way. The State would remain liable for 50% of amounts ordered and incurred even between May 14, 1991 and June 30, 1992, and for more than 50% to the extent that joint and several liability was properly invoked." The State's position would simply "change the timing of each party's payments." The State reasons that the court included the limit to provide a respite or "breathing space" to the State for budgeting purposes.
 
 
 11
 While our decision must turn on the meaning of the language of our decision in Jenkins II, certain facts we have referred to above are particularly significant. The first is that the district court has issued twenty orders approving additional capital costs after Jenkins II, including $61,756,730 for land acquisition, $10,665,018 for furniture, and $9,141,790 for Central High School and asbestos abatement. The State has appealed only two of these orders, and we affirmed those orders concerning Central High School and asbestos abatement in Jenkins IV. 931 F.2d at 478-79, 481-83. Further, the State's decision to limit expenditures was a budgeting decision, made unilaterally without seeking court approval, and in the face of other orders increasing capital improvement expenditures. It is evident that this decision would, of necessity, substantially impact the ongoing capital construction program in KCMSD.[5]
 
 
 12
 We believe that the language in our Jenkins II decision, particularly that appearing at 855 F.2d at 1306, "the approximately $150,000,000 which is the State's share of capital improvements" through the 1991-92 fiscal year is, most patently, an approximation. The $150,000,000 figure was mentioned in the context of a discussion in which we specifically noted that the plan we affirmed did not cover all expenditures necessary for the period in question, including $16 million for land acquisition and asbestos abatement costs. Id. Similarly, the order we affirmed made clear that the plan approved by the court did not include the costs of acquiring or preparing sites for new facilities or relocating students. Jenkins v. Missouri, 672 F.Supp. 400, 408 (W.D.Mo.1987). Finally, we were aware in Jenkins II that the bonds issued by KCMSD to fund its share of capital improvements would produce interest earnings which could be used to offset some of the expenses not included in the figures which were before us. 855 F.2d at 1306.
 
 
 13
 Our discussion in Jenkins II also makes clear that in discussing the capital improvement plan we were dealing with renovation and construction of buildings to house educational programs as the remedy for constitutional violations. Id. at 1305-06. While we recognized that land acquisition and asbestos removal costs were not included in the figures before us, and that the $16 million estimate for these items might well be offset by interest earnings, there is nothing in our discussion to demonstrate that the construction and renovation funds were to be reduced by land acquisition costs of which we were then unaware. Further, while we did not point to this specific language in the district court order in Jenkins II, we later recognized that the original budget "consist[ed] of studied estimates which would be adjusted as actual costs [were] ascertained." Jenkins IV, 931 F.2d at 481 (citations omitted). In considering district court orders increasing funding for asbestos abatement costs in the amount of $910,225, and increasing funding for the construction of Central High School in the amount of $8,231,565, neither the parties nor this court raised the question of whether these increases would diminish the capital improvement budget that had already been approved. It was in this context that we referred to the jurisdiction of the district court to modify its injunctions and the practical flexibility in shaping remedies and adjusting and reconciling public and private needs. 931 F.2d at 482 (quoting Milliken v. Bradley, 433 U.S. 267, 288, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977) (Milliken II )). Similarly, site acquisition costs for Central had not been in the original budget, and the State did not contest this in Jenkins IV. 931 F.2d at 481.
 
 
 14
 We cannot accept the State's arguments that "the approximately $150,000,000" contained in Jenkins II constitutes the State's absolute limit for capital expenditures, particularly in view of the fact that nothing before us at that time suggested that land acquisition costs would be so substantial. Our Jenkins II decision dealt with renovating and constructing classroom facilities to remedy constitutional violations, and the figures we discussed in that opinion cannot be diminished by the amounts approved in later district court orders, most of which were not appealed, or in appealed orders we affirmed without the issue of the limitation being raised.[6] The State's argument to the contrary is not persuasive.
 
 
 15
 The State concedes that the money is due and payable after July 1, 1992, so there is no question here as to ultimate liability, but only an issue as to when money, admittedly due, must be paid. We believe that the State's position in this respect contains an inconsistency. To argue that the Jenkins II $150,000,000 limit applies only to the timing of the payment, and not to the liability for the payment, is to urge contradictory positions. While the State suggests that the limit was provided in Jenkins II to give it a respite in expenditures, we cannot accept this argument in view of the ongoing course of this litigation and the numerous district court orders approving capital improvement expenditures. Indeed, the State's acceptance of liability for these expenses undercuts their argument as to timing. Accordingly, the district court did not err in its determination that the $150,000,000 limit mentioned in Jenkins II did not support the State's decision to terminate payments into the capital fund under the drawdown procedures.
 
 
 16
 Having said this much, we are aware that the parties made numerous concessions at oral argument that make it unnecessary for us to either halt the capital improvement program in the KCMSD in its tracks, or require the State to make additional unbudgeted expenditures which it says will result in substantial reductions of funding of programs throughout the state. The problem is entirely one of preventing a temporary shortfall in funds resulting from the State's cessation of payments during the remaining 1991-92 school year, coupled with the State's assurance that it will pay these funds in full after July 1, 1992. Short term financing is an obvious solution to this problem, but the parties have been unable to reach agreement as to how to resolve the problem, each urging that the responsibility of obtaining the financing is that of the other. Perhaps an order from this court gives the parties a certain sense of comfort. The parties' statements in their briefs and at oral argument point the way to resolving this impasse. KCMSD has stated that there are no legal impediments to its obtaining a loan to bridge this short-fall, except for its inability to repay it. Although there is some difference between the parties as to how much money would have to be borrowed, in view of the concessions made, there is little reason to believe that the parties cannot agree on this amount.[7] The State made clear in oral argument and in the briefs before us that it is willing to commit to paying its share of the remaining 1991-92 capital improvement funding after July 1, 1992.
 
 
 17
 Under these circumstances, to fund this interim shortfall of an obligation we have held to be the responsibility of the State, it is appropriate to order that KCMSD undertake the necessary activities to obtain an interim loan, and to order that the State give its commitment in writing to KCMSD that it will pay its remaining share of the 1991-92 capital improvements amount after July 1, 1992, and provide required documents to KCMSD and to the necessary financial institutions to acknowledge this obligation.[8] The commitment must be sufficiently specific to satisfy the financial institutions. The parties are ordered to work together cooperatively, under the district court's direction, if need be, to obtain this interim financing.
 
 
 18
 There remains the question as to responsibility for payment of interest on what is essentially a bridge loan. This makes appropriate a number of additional observations. The ultimate issue in this case, as it has been over the years, is remedying serious and pervasive constitutional violations. Jenkins II, 855 F.2d at 1300 (quoting Jenkins v. Missouri, 593 F.Supp. 1485, 1492 (W.D.Mo.1984) ("the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District") and Jenkins v. Missouri, 639 F.Supp. 19, 24 (W.D.Mo.1985) ("Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD") and Jenkins, 672 F.Supp. at 411 ("KCMSD's physical facilities have literally rotted")).
 
 
 19
 The entire thrust of the district court's orders as well as those of this court has been to effectuate remedies for the constitutional violations as soon as possible. KCMSD acted upon this understanding in making these capital expenditures. The unilateral action of the State, without court approval, could only work to impede this goal.
 
 
 20
 The district court has called upon the Missouri legislature to encourage it to consider legislation giving the KCMSD versatility to raise funds to support the desegregation program. That legislation was introduced, received unfavorably, and failed. See Jenkins, 672 F.Supp. at 411; Jenkins II, 855 F.2d at 1309. It must be recognized that the State has bonding capacity which it could use to spread the costs of desegregation expenses over a number of years. Missouri Health and Educational Facilities Act, Mo.Rev.Stat. § 360.109 (Supp.1989). The State has chosen not to use the procedure, however, because, as it stated in its briefs filed in this action, "key legislators have opposed use of that type of bond." The net effect has been that the State has made capital expenditures out of current funds. Further, as discussed, the need for interim financing has been caused essentially by the State's unilateral budgeting decision, made absent a court order, based on its interpretation of this court's opinion in Jenkins II. The State's own decisions have thus placed it in the position that it now finds itself. Accordingly, we believe that the appropriate relief requires that the State pay the interest on this interim financing.
 
 
 21
 Should the efforts to obtain interim financing for some reason fail, the burden will fall upon the State to pay the share, which it admittedly owes, during the 1991-92 school year. The interim financing procedures which we order here will eliminate the need for the drastic budget cuts the State has argued that it will otherwise be compelled to make. We must again express our strongest thoughts that the State has the ability to consider alternative funding sources for KCMSD, including utilizing the bonding capacity under the Missouri Health and Education Facilities Act. The use of these sources admittedly involve powers that the State is free to use as it chooses, but we simply so state to make clear that the opportunity to achieve a more desirable solution to the financial burdens of the desegregation remedy rests with the State, and to the extent that the KCMSD may increase its own tax levy by vote, with the KCMSD.
 
 
 22
 In sum, we affirm the order of the district court that the State was not justified under our language in Jenkins II in limiting its payments during the 1991-92 school year. In order to alleviate the problems caused by budgeting decisions and to eliminate the necessity of the State's having to make cuts in other program expenditures, we make the following orders:
 
 
 23
 (1) KCMSD shall apply for interim financing with banks or other financing institutions;
 
 
 24
 (2) the State will provide a written commitment to KCMSD and appropriate banks or financing institutions that on or after July 1, 1992, it will pay 50 percent of those amounts ordered and incurred between May 14, 1991, and June 30, 1992, and for more than 50 percent to the extent that joint and several liability is invoked by the district court;
 
 
 25
 (3) the interest for said loan will be paid by the State;
 
 
 26
 (4) the parties shall work together in making the necessary arrangements for this financing; and
 
 
 27
 (5) the case is remanded to the district court for any further orders necessary to effectuate the relief we have directed in this opinion.
 
 
 
 [1]
 The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri
 
 
 [2]
 We affirmed drawdown procedures in Jenkins v. Missouri, 931 F.2d 470, 475-78 (8th Cir.) (Jenkins IV ), cert. denied, --- U.S. ----, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991)
 
 
 [3]
 We observed that the original $15 million figure for the construction of Central consisted of studied estimates that were meant to be adjusted as actual costs were ascertained, that the initial budget did not include engineering and architectural fees, and that the space tentatively planned had proved to be inadequate. 931 F.2d at 482-83. We concluded that the district court did not err in ruling that the increased construction and equipment budgets were necessary to meet design requirements, and that the district court had the equitable power to modify its earlier order. The State did not raise any issues relating to site acquisition costs or the increase in the equipment budget. Id. at 481-483
 
 
 [4]
 There was also a controversy about $7.4 million the district court had ordered the State to make available to the capital account in an order of October 29, 1990. The district court held that this issue was moot, as it had rejected the State's position that there was a limit on the expenditures. Slip op. at 3
 
 
 [5]
 KCMSD estimates that the shut-down expenses of its construction program would be approximately $12,000,000
 
 
 [6]
 The State argues that it stated in three filings before the district court that it was relying on the $150,000,000 capital contributions limit set forth in Jenkins II. The State contends that it set forth these limits in filings made on December 10, 1988, with respect to furniture purchases, and on January 25, 1989, with respect to asbestos abatement. In both instances, KCMSD urged that these expenditures should not be classified as capital expenses within the $150,000,000 limit. Finally, the parties filed a joint stipulation on November 9, 1990, in which a similar statement was made. These three statements in the mass of filings may establish the State's position on this question, but do not demonstrate an effort by the State to obtain a ruling by the district court on this question before it made its unilateral budgeting decision in May 1991
 
 
 [7]
 We also observe that under the drawdown procedure which we approved in Jenkins IV, funds are not advanced until needed and the interest on these loans would thus be incurred on somewhat less than the full amount required
 
 
 [8]
 The State concedes in its brief that it "remain[s] liable for 50% of amounts ordered and incurred ... between May 14, 1991 and June 30, 1992, and for more than 50% to the extent that joint and several liability was properly invoked"