Kalima **JENKINS**, by her friend, Kamau **AGYEI**; Carolyn Dawson, by her next friend Richard Dawson; Tufanza A. Byrd, by her next friend, Teresa Byrd; Derek A. Dydell; Terrance Cason, by his next friend, Antoria Cason; Jonathan Wiggins, by his next friend, Rosemary Jacobs Love; Kirk Allan Ward, by his next friend, Mary Ward; Robert M. Hall, by his next friend, Denise Hall; Dwayne A. Turrentine, by his next friend, Sheila Turrentine; Gregory A. Pugh, by his next friend, David Winters, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

American Federation of Teachers, Local 691, Plaintiffs,

v.

**STATE OF MISSOURI**; John Ashcroft, Governor of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Missouri State Board of Education; Roseann Bentley; Dan L. Blackwell; Gary M. Cunningham; Raymond

756

McCallister, Jr.; Susan D. Finke; Thomas R. Davis; Cynthia B. Thompson, Members of the Missouri State Board of Education; Robert E. Bartman, Commissioner of Education of the State of Missouri, Defendants–Appellants,*

School District of Kansas City, Missouri; Claude C. Perkins, Superintendent thereof, Defendants–Appellees.*

Kalima JENKINS, by her next friend, Kamau AGYEI; Carolyn Dawson, by her next friend, Richard Dawson; Tufanza A. Byrd, by her next friend, Teresa Byrd; Derek A. Dydell, by his next friend, Maurice Dydell; Terrance Cason, by his next friend, Antoria Cason; Jonathan Wiggins, by his next friend, Rosemary Jacobs Love; Kirk Allen Ward, by his next friend, Mary Ward; Robert M. Hall, by his next friend, Denise Hall; Dwayne A. Turrentine, by his next friend, Sheila Turrentine; Gregory A. Pugh, by his next friend, David Winters; on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

American Federation of Teachers, Local 691, Intervenor–Appellee,

v.

STATE OF MISSOURI; John Ashcroft, Governor of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Missouri State Board of Education; Peter Herschend, Member of the Missouri State Board of Education; Raymond McCallister, Jr., Reverend, Member of the Missouri State Board of Education; Susan D. Finke, Vice–President, Member of the Missouri State Board of Education; Thomas R. Davis, Member of the Missouri State Board of Education; Robert E. Bartman, Commissioner of Education of the State of Missouri; Gary D. Cunningham, President, Member of the Missouri State Board of Education; Rebecca M. Cook,

Member of the Missouri State Board of Education; Sharon M. Williams, Member of the Missouri State Board of Education; Jacquelline Wellington, Member of the Missouri State Board of Education, Defendants–Appellants,*

School District of Kansas City; Walter L. Marks, Superintendent thereof, Defendants–Appellees.*

Nos. 90–2238, 91–3636, 92–3194 and 92–3200.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1993.

Decided Nov. 29, 1993.

As Amended on Denial of Rehearing Feb. 24, 1994.

Rehearing En Banc Denied March 15, 1994.**

* Although we are aware that many of those named as defendants no longer hold their offices and substitution of public officers is automatic under Fed.R.App.P. 43(c), the parties have not notified us of the names of the successors in office.

Therefore, we have not amended the style in this case.

** Editor's Note: The court's order denying rehearing en banc and the dissent thereto will be pub-

Bart A. Matanic, Asst. Atty. Gen., Jefferson City, MO, argued for appellant.

Daniel B. Kohrman and Kevin J. Lanigan, Washington, D.C., argued, for Kelima Jenkins, et al.

Shirley Ward Keeler and Arthur A. Benson, II, Kansas City, MO, argued, for Kansas City School Dist.

Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The State of Missouri appeals from four orders of the district court[1] entered in the ongoing Kansas City school desegregation case. The district court ruled in two orders that base costs of the original group of magnet schools were properly included as desegregation costs, which the State could be required to pay as a result of its joint and several liability for desegregation expenses. The State argues that the district court erred in placing this expense on the State, because in earlier orders the district court had required that these orders be paid by the Kansas City, Missouri School District. The State appeals the district court order approving certain quality education programs known as *Milliken II* programs after *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*), for the

---

lished in a subsequent advance sheet. See 1994 WL 79717.

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri.

1992–93 school year.[2] The State contends that the *Milliken II* programs already in place had achieved the goals set for them, and had attained unitary status under *Freeman v. Pitts*, —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), and the district court erred in not recognizing this and in ordering further programs. Finally, the State appeals from orders requiring the State to pay for a salary increase for KCMSD teachers and other employees. We affirm the orders of the district court.

## I.

The first two appeals involve orders allowing the base costs of the "flagship magnets" as desegregation expenses for which the State and KCMSD are jointly and severally liable. The flagship magnets (also referred to as the "1986–87" magnets in reference to their inception date) are schools that existed before the desegregation remedy and were converted into magnet schools as part of the desegregation remedy.[3] The costs that KCMSD would have incurred in running these schools, regardless of the desegregation remedy, are referred to as "base costs." Costs associated with the magnet themes are called "incremental magnet costs."

In the original magnet school order, June 16, 1986, the court made no distinction between base costs and incremental costs for the flagship schools, but classified the total amount as a desegregation expense, allocating half to the State and half to the KCMSD. *Jenkins v. Missouri*, 639 F.Supp. 19, 53–55 (order on pending motions) (W.D.Mo.1985), *aff'd*, 855 F.2d 1295 (8th Cir.1988), *cert. denied as to this order*, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). The State alluded to this very briefly in an appeal of that funding order, complaining that the district court "held all of the operating costs of the schools, whether part of the original bud-

gets or newly ordered by the court, were to be counted as necessary desegregation expenses," and that the court had "effectively transfer[red] to the desegregation plan all of the operating expenses of the schools." We affirmed the June 16, 1986 order, though without discussion of this point. *Jenkins v. Missouri*, 855 F.2d 1295, 1319 (8th Cir.1988) *(Jenkins II )*, *cert. denied in relevant part*, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989).

The district court in November 1986 ordered a more extensive "Long Range Magnet Plan" which created new magnets in addition to the flagship magnet schools. The Long Range Magnet Plan budget distinguished between base and incremental costs for the new magnets, and required the KCMSD to pay base costs from its operating budget. On July 25, 1988, the district court decided that the flagship magnets and the new magnets should be funded according to the same principles, and that it would therefore not require the State to pay the base costs for the flagship magnets for 1988–89. Because the KCMSD could not show which costs were base and which incremental, the court simply included the whole cost in the desegregation budget, but allowed the State a credit for the base amount, which was to be determined later. The court issued a similar ruling for 1989–90.

Before the State obtained the benefit of these credits, however, money problems intervened. The court stayed the orders requiring the KCMSD to pay the 1988–89 and 1989–90 base costs, pending a review of KCMSD's finances by an independent consulting firm to determine what KCMSD could pay for out of its operating budget.[4]

Two orders are on appeal, dated June 26, 1990 and July 5, 1991, in which the district court approved the total expenses for the

---

2. The *Milliken II* programs included extended day, effective schools, 1986–87 magnets, district communications, security, playground equipment, Central High School athletic team travel, and extended day program for Westport School.

3. The flagship magnets are the three schools of the Southwest cluster (Cook, Hartman, and Marlborough), Swinney and Volker, and the Lincoln College Preparatory magnet.

4. By later agreement of the parties, the State actually recovered the money from the 1988–89 and 1989–90 credits, out of the proceeds from property taxes that had been paid into escrow but were released for the District's use after the Supreme Court affirmed the property tax order under which they were authorized.

flagship magnets as desegregation expenses for the years 1990–91 and 1991–92, respectively. In those orders, the court allocated the flagship base costs entirely to the KCMSD, but the effect of joint and several liability is that the State could be called on to pay these costs. In the 1990–91 order the court stated that the consultant's study was still pending, and that if the report should result in the February 1, 1990 stay order being lifted, the State could receive a credit for the base costs. In the 1991–92 order the court stated the budget study did not indicate that the KCMSD had the money to pay the base costs from its operating budget, and therefore, the costs would have to be shifted to the desegregation budget.

The State's objection is that by designating the 1990–91 and 1991–92 base costs as desegregation expenses, payable by the KCMSD, the court is indirectly requiring the State to pay the costs, through the operation of joint and several liability. The State raises four arguments against such a result.

First, the State argues that requiring it to pay for the ordinary costs of operating KCMSD's schools is impermissibly granting relief not related to the State's constitutional violation, since KCMSD would have had to pay the operating costs of its schools, whether or not the State ever committed a constitutional violation.

The cases the State cites are not directly applicable, since they either address situations in which there was no relation between the remedy ordered and the constitutional violation,[5] or simply refer generally to the requirement that the remedy be limited to rectifying conditions that offend the Constitution.[6] As we discuss at length in Part II, the effect of the constitutional violations in this case was to lessen student achievement in the KCMSD and to cause white flight. *Jenkins II,* 855 F.2d at 1300. It has already been determined that the proper remedy for

these injuries is to improve the quality of education given to minority students and to implement superior educational programs that will attract white students back to the District and redistribute the whites concentrated in certain parts of the District. *Id.* The flagship magnet schools are a cornerstone of the remedial plan. The relation between payment of the magnets' base costs and the success of the constitutional remedy is evident. If KCMSD cannot pay the basic costs of keeping the schools open, the magnet programs at those schools cannot go forward and the remedial plan will be stillborn. It is therefore consistent with *Milliken II* to require the State to pay costs the KCMSD would have been otherwise responsible for when KCMSD cannot pay, and when failure to pay would fatally undermine the constitutionally-mandated remedy. In fact, it is settled law in this circuit that a desegregation remedy can require the State to pay the entire costs of educating at least some of a district's students, since we affirmed such an order in St. Louis over the same sort of objection the State makes here. *See Liddell v. Missouri,* 801 F.2d 278, 282–83 (8th Cir. 1986) (*Liddell IX*).

Next, the State argues that the district court's decision to place the base costs in the desegregation budget is inconsistent with other decisions that the district court has made in this case. The State argues that the authority of the court's orders separating base and incremental costs for the flagship magnets' 1988–89 and 1989–90 funding is not affected by the February 1, 1990 stay of those orders and the rationale of those orders should govern later years. We have recognized the practical flexibility of the court in shaping remedies and adjusting and modifying injunctions in *Jenkins v. Missouri,* 931 F.2d 470, 482 (8th Cir.) (*Jenkins III*), *cert. denied,* —— U.S. ——, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991), particularly where there

---

**5.** *Milliken v. Bradley,* 418 U.S. 717, 744–45, 94 S.Ct. 3112, 3126–27, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *Liddell v. Missouri,* 731 F.2d 1294, 1309 (8th Cir.) (*Liddell VII*), *cert. denied,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).

**6.** *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992); *Milliken v.*

*Bradley,* 433 U.S. 267, 281–82, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) (*Milliken II*); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *Arthur v. Nyquist,* 712 F.2d 809, 813 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984).

are changed circumstances. The district court exercised this flexibility when it changed from full desegregation funding for the flagship magnets (as it had ordered before 1988–89) to separating base from incremental costs. In response to a budget study which "did not indicate that the KCMSD has resources available from its operating budget to support the base budgets," the court once again consolidated the base costs with incremental costs. There was adequate rationale for the change and the 1990–91 and 1991–92 orders do not conflict with the court's earlier treatment of the base costs.

The State quotes language from the district court opinion of July 5, 1991, in which the court rejected the KCMSD's "no money" argument in another context. The KCMSD had argued that because it was always out of money and could not pay for its operating costs, its operating and desegregation budgets should be merged, with the State required to pay any expenses the KCMSD could not afford. The district court rejected this argument, stating, "There is no legal authority for essentially transforming the State into a guarantor of KCMSD operating budget shortfalls." Order of July 5, 1991 at 9. The court then advised KCMSD either to pursue additional funding or to institute cuts to balance its operating budget. Even granting that there may be tension between the July 5, 1991 decision and the orders before us, the district court did not err or abuse its discretion in making an adjustment or modification of its earlier equitable orders dealing with the flagship magnets' funding, so vitally important to the remedy of the constitutional violations.

■ Finally, the State suggests that the entire issue should be remanded to the district court for reconsideration in light of the State's enactment of a new school finance formula, which the State argues will provide significantly greater state funding to KCMSD. This new development may well affect funding in future years, but at this point we simply do not know how. Any effect it may have will be determined by the district court as it considers future funding orders. It is not appropriate that we consider it in the first instance.

The parties evidently delayed the presentation of this appeal for some time in the hopes that the issue would be settled by the report of the independent consultant. It was only when the report's result did not reveal sufficient money available to KCMSD to solve the problem that the State prosecuted its appeal. We view this as a recognition of the need to balance the many conflicting issues in crafting an appropriate remedy, and this further supports our conclusion that we should affirm the district court's orders with respect to the base costs of the flagship magnets.

## II.

■ The State argues that the district court erred as a matter of law or, in the alternative, abused its discretion by failing to address in its June 17, 1992 order the State's argument that the *Milliken II* quality education programs were unitary. Even if the district court was not obliged to make findings on this issue, the State argues that it abused its discretion in failing to hold the district unitary in the quality education area. We affirm the district court's judgment.

KCMSD submitted its motion for approval of the desegregation plan for 1992–93, including continuation of the *Milliken II* programs, which the court had originally approved in order to improve student achievement in the KCMSD. While the KCMSD's motion was pending, the United States Supreme Court decided *Freeman v. Pitts*, —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The State then relied on *Pitts* to argue that the *Milliken II* programs had been implemented fully and that the court should declare these programs unitary and return responsibility for them to the school district. The court held a hearing on the 1992–93 budget issues on May 27 to 29, 1992, and while rejecting some requests, ordered most of the *Milliken II* programs fully funded.

■ The June 17, 1992 order approved the KCMSD's 1991–92 budgets without comment. Order of June 17, 1992 at 7. In granting the funding, it is evident that the district court rejected the State's arguments. The district court did not err in so ruling,

even though it did not articulate its reasoning in approving the funds. Rejection of the State's argument is demonstrated by the district court's failure to make findings based on these arguments. *See Switzer Brothers, Inc. v. Locklin,* 297 F.2d 39, 45 (7th Cir.1961) ("[F]ailure to enter findings with respect [to certain evidence] is tantamount to findings adverse to appellants upon the evidence."), *cert. denied,* 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962). The district court need not make specific findings on all facts, but must only rule on the ultimate facts necessary to reach a decision in the case. *United States v. F.D. Rich Co., Inc.,* 439 F.2d 895, 899 (8th Cir.1971); *Falcon Equip. Corp. v. Courtesy Lincoln Mercury, Inc.,* 536 F.2d 806, 808 (8th Cir.1976) ("It is well established that the trial court does not need to make specific findings on all facts but only must formulate findings on the ultimate facts necessary to reach a decision."). The district court's order some nine months later in which it anticipated an orderly and gradual withdrawal of court control demonstrates the court's grasp of the *Freeman v. Pitts* argument asserted by the State, and of the issues there raised.

Were we to entertain any question about the import of the district court's June 17, 1992 order, the district judge's comments from the bench during the hearing and later orders raising the same or similar issues answer our concerns. The State argues that the court should have declared the KCMSD unitary in regard to the quality education programs because the only goal of the desegregation remedy is the "full implementation" of the remedial programs, which the State asserts it has accomplished. However, during the hearing the court pointed out that the goal was not to implement certain programs, but rather to integrate the school district. Judge Clark stated:

> The [c]ourt's goal was to integrate the Kansas City, Missouri, School District ... and all these other matters were elements to be used to try to integrate the [KCMSD].... That's the goal. And a high standard of quality education. The magnet schools, the summer school program and all these programs are tied to that goal.... But when [the State] says

no particular goal has been set, I think [it is] in error.

Judge Clark's order rejecting funding for some of the programs and granting funding for continuation of other programs could only have done so on the basis that the goals of the desegregation programs, the elimination of the vestiges of past discrimination to the extent practicable, had not yet been achieved.

Because this desegregation litigation is ongoing, we also find it appropriate to refer to later orders which show that the district court considered and rejected the State's arguments. Nine months after the order giving rise to this appeal, the court considered a motion for approval of the Long Range Magnet Renewal Plan. On April 16, 1993, the district court entered an order which dealt more explicitly with many of the arguments now urged by the State. Order of April 16, 1993. None of the parties has appealed this April 1993 order. Yet, this order helps illuminate the June 1992 order now before us. In the April order, the district court made the sort of findings contemplated by *Freeman,* anticipating an orderly and gradual withdrawal of court control. *See* — U.S. at ——, 112 S.Ct. at 1445.

In the April 1993 order, the district court defined the first issue as whether the magnet programs have improved the educational lot of the victims of unconstitutional segregation and whether approval of the Long Range Magnet Renewal Plan would likely result in additional educational progress. The second issue was whether the original Long Range Magnet Plan had helped the KCMSD reverse white flight, and whether the Long Range Magnet Renewal Plan would bring more white students into the District. The third issue the court considered was whether the magnet programs have redistributed the students within KCMSD for maximum desegregation and whether the Renewal Plan would result in stabilization and further enhancement of desegregative gains.

The district court commented on the substantial progress made in desegregating KCMSD schools. The court found that there had been a trend of improvement in aca-

demic achievement, but that the school district was far from reaching its maximum potential because KCMSD is still at or below national norms at many grade levels. Order of April 16, 1993 at 11. The court observed that the magnet school plan has been successful overall, with a substantial pool of suburban whites expressing an interest in attending KCMSD magnet schools. *Id.* at 9. The educational opportunities afforded in the magnet schools are better than previously available. *Id.* at 13. The court then extended the duration of the magnet plan. *Id.* at 14. The court stated that it was important to maintain the magnet plan as it is because of the positive impact on both the desegregation effort and on achievement. *Id.* at 20. The court ordered a two-year extension of the current plan (with certain modifications) in order to maintain the integrity of the programs currently offered, and to allow the KCMSD to better measure the effectiveness of the programs. *Id.* The court expressed a need for the parties' views of an effective method by which the district may fund its share of the programs. It directed the KCMSD to submit a plan commensurate with current funding or at a level permitting maintenance of the same quality of both facilities and instruction, assuming withdrawal of court ordered funding at alternative intervals of three, five, seven or ten years. *Id.* at 21.

In essence, the court's order indicated that the magnet school plan had been substantially successful, that further areas for improvement still existed, and that the court was looking forward to the day when a gradual phase-out would be considered. This order specifically addresses the issues raised by *Freeman v. Pitts. See* —— U.S. at ——, 112 S.Ct. at 1446 (listing factors a district court must consider to order a partial withdrawal of its supervision).

Further, the district court's July 30, 1993 [7] order regarding *Milliken II* programs expressly decides these issues. The State appealed this order but raised no *Freeman v. Pitts* arguments; the State only attacks the salary issue. We refer to the July 1993 order only as it fleshes out the meaning of the earlier district court orders dealing with the *Freeman* issues. In the July order the district court stated that it had previously ruled in the April 16, 1993 order as a result of the Long Range Magnet Renewal Plan that "KCMSD has not met the goals and standards set by the [c]ourt in establishing the desegregation remedy." Order of July 30, 1993 at 3. The court unambiguously stated: "The court finds that the State's arguments that these components have attained unitary status are unpersuasive." *Id.* These statements leave no doubt that the court rejected the State's *Freeman* arguments in July 1993, and it follows that in this ongoing litigation, it did so in the earlier orders dealing with the issue.

The court said next that the State argues inconsistently that the desegregation plan is a complete failure, but on the other hand, that the *Milliken II* components are completely successful. The court also concluded that the State has continued to make fundamentally flawed arguments in pursuit of an order determining unitary status in the KCMSD. The court found that the *Milliken II* components have been partially successful in implementing the goals and standards of the desegregation remedy, but the components have not yet met these goals in their entirety. The court's statements in its July 30, 1993 order, which the State referred to only most obliquely in the argument of the issues before us, substantiates our reading and interpretation of the orders heretofore entered by the district court.

■ The State next argues that even if we conclude (as we have) that the district court was not obligated to issue findings of fact regarding the success of the *Milliken II* programs, the district court abused its discretion when it held that the *Milliken II* programs were not unitary. The essence of the State's argument is that it complied fully and satisfactorily with all court orders, insofar as the remedial programs have been fully implemented and funded for a seven-year period. This, it argues, is the extent of its liability. We reject the State's argument that the District has achieved unitary status

7. This appeal bears our docket No. 93–3274, and was argued November 3, 1993.

regarding the quality education offered its students.

The Supreme Court has twice in recent years considered the standards to be employed in determining whether a school system has become unitary.

First, in *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 245, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991), the Supreme Court stated that in determining whether there was constitutional compliance in a school desegregation case, the district court "should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Id.* at 249–50, 111 S.Ct. at 638. The Court itemized a number of facets of school operation that a court should consider in determining whether the vestiges of *de jure* segregation had been "eliminated as far as practicable," including "student assignments, ... 'faculty, staff, transportation, extra-curricular activities and facilities.'" *Id.* (quoting *Green v. New Kent County School Bd.,* 391 U.S. 430, 435, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968)).[8]

Second, in *Freeman v. Pitts,* the Court dealt specifically with whether a district court could withdraw incrementally from supervising a school desegregation case. The Court held that the Court of Appeals for the Eleventh Circuit erred in requiring retention of full remedial authority until a school district had achieved unitary status in all categories. —— U.S. at ——, 112 S.Ct. at 1446.

In discussing the meaning of "unitary," *Freeman* began with the basis for the court's exercise of equitable power. The Court stated:

> The essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action. Equitable remedies must be flexible if these underlying principles are to be enforced with fairness and precision.... "The task is to correct,

by a balancing of the individual and collective interest, the condition that offends the Constitution." The requirement of a unitary school system must be implemented according to this prescription.

*Id.* at ——, 112 S.Ct. at 1444 (citations omitted).

*Freeman* stressed that the end purpose of a court's supervision is to remedy the violation and then to restore to state and local authorities control of the school system. *Id.* at ——, 112 S.Ct. at 1445. Partial relinquishment of judicial control can be a significant step in fulfilling the district court's duty to return the control of schools to local authorities. *Id.* "A transition phase in which control is relinquished in a gradual way is an appropriate means to this end." *Id.* The Court continued:

> [O]ne of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution.

*Id.*

*Freeman* authorizes a district court to relinquish control in stages, outlining the analysis it should follow and requiring careful articulation of its reasoning. The district court is given discretion based upon its assessment of many factors, some of which are most intangible:

> A court's discretion to order the incremental withdrawal of its supervision in a school desegregation case must be exercised in a manner consistent with the purposes and objectives of its equitable power. Among the factors which must inform *the sound discretion* of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to

---

8. Another factor to be considered is the quality of education offered to the white and black stu-

dents. *See Freeman,* —— U.S. at ——, 112 S.Ct. at 1437.

the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the law and the constitution that were the predicate for judicial intervention in the first instance.

*Id.* at ——, 112 S.Ct. at 1446 (emphasis added).

In order to analyze this case under *Freeman v. Pitts* to determine if KCMSD has achieved unitary status, we must consider the constitutional injury, the methods selected to remedy that injury, the goals of the remedy, and the success achieved by the remedy in eliminating the vestiges of the constitutional violations to the extent practicable.

Of course, the injury is that vestiges remain of the dual school system once required by the State of Missouri. Those vestiges take the form of reduced student achievement and white flight, resulting in the anomaly of a racially isolated school district in the midst of a population with a far different racial makeup. In *Jenkins II*, we quoted the district court's findings:

"[W]itnesses confirmed the conclusion reached by the Supreme Court in *Brown I* [*Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ] that forced segregation ruins attitudes and is inherently unequal.... The general attitude of inferiority among blacks produces low achievement which ultimately limits employment opportunities and causes poverty." "Segregation has caused a system wide *reduction* in student achievement in the schools of the KCMSD."

. . .

The district court found that segregation in KCMSD caused the departure of the whites in the system to private schools and to the suburbs. During the years between *Brown I* and trial, the enrollment of KCMSD shifted from predominantly white to predominantly black. In the 1958–59 school year, blacks constituted 22.5% of KCMSD enrollment, but by 1983–84 enrollment was 67.7% black and white enroll-

ment had dropped 80%. "[A]s of 1974, 20 years after *Brown I*, 39 schools were more than 90% black.... Eighty percent of all blacks in the District attended schools that were 90% black...." KCMSD later reduced the number of over-90%-black-enrollment-schools, but the district court found in 1984 that KCMSD had still not completely dismantled the dual system. 855 F.2d at 1300 (citations omitted).

The remedy consisted of a capital improvements plan to rectify the decay in the school's physical facilities,[9] numerous quality education programs, and a far-reaching magnet school plan. The goals of the remedial programs were: (1) to compensate the victims by improving the education given them; (2) to enhance the programs so as to reverse the white flight pattern, winning back white students from private and suburban schools, and thus ending the racial isolation of the victims; and (3) to use the magnet schools as a way of bringing about voluntary redistribution of children within the KCMSD itself. *Id.* at 1302.

The substance of the State's argument is that the *Milliken II* quality education programs have been established successfully and are of superior quality to those programs offered in the suburban school districts and, therefore, that the goal of ameliorating inferior educational opportunities has been accomplished. The State presented Dr. Terrance Stewart, Assistant Commissioner of Education for the State of Missouri, as its witness with respect to the implementation of the *Milliken II* programs. The district court viewed his testimony as giving a glowing report of the success of the programs. However, the court made clear that the goal was to integrate the Kansas City, Missouri School District, and that the various programs were tools to be used to do so. The court rejected Dr. Stewart's argument that no goals had been achieved. It is also significant that the testimony of Dr. Stewart did no more than describe the successful establishment of the several educational programs, but gave no indication of whether these programs had

---

9. The capital improvements are not before us in this appeal. *But see Jenkins II*, 855 F.2d at 1300, 1306–07.

succeeded in improving student achievement. On the other hand, KCMSD's Superintendent Walter Marks, and Assistant Superintendent of Instruction Art Rainwater, testified that while the programs had been established and progress was being made both in academic achievement and reduction of racial isolation, much remains to be done.

The only evidence before the district court with respect to the degree of progress on elimination of vestiges of past discrimination was at best that a start had been made. The evidence on the record fell far short of establishing that such vestiges had been eliminated to the extent practicable. *See Freeman,* —— U.S. at ——, 112 S.Ct. at 1446 (quoting *Dowell,* 498 U.S. at 249, 111 S.Ct. at 638). These tests, articulated in *Dowell* and *Freeman,* answer the State's argument that establishment of the programs by compliance with the court order is all that is required.

Further, *Freeman* did not indicate that the State is entitled to be released upon accomplishment of any particular objective without also considering whether retention of judicial control was necessary or practicable to achieve compliance with the decree in other facets of the school system. The State did not try to prove that it has demonstrated a good faith commitment to the whole of the court's decree. *See Freeman,* —— U.S. at ——, 112 S.Ct. at 1446; *see Brown v. Board of Educ.,* 978 F.2d 585, 592 (10th Cir.1992) ("[S]pecific policies, decisions, and courses of action that extend into the future must be examined to assess the [defendant's] good faith."), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993).

KCMSD argues that the State's evidence is insufficient to justify exercise of the court's discretion to grant unitary status under *Freeman.* KCMSD's argument has much merit, but the State asks only that we hold the district court abused its discretion in continuing the education programs.

We have considered the State's arguments in considerable detail, and we are satisfied that Judge Clark's comments during the four-day hearing show that he fully considered the State's *Freeman* arguments. In his order, he rejected funding for some of the programs, while granting the funds for others; thus, he implicitly rejected the State's *Freeman* arguments. While it might have been desirable for the court to articulate explicitly even a conclusory rejection of the State's *Freeman* arguments, the district court did not abuse its discretion in continuing the quality education programs.

In view of the State's arguments that under *Freeman* it is entitled to a determination on an incremental basis that KCMSD has become unitary, a few further words are appropriate.[10] *Dowell* and *Freeman* both outline in considerable detail the nature of the inquiry the district court must undertake in considering this issue. These principles must be applied in analyzing the question of unitariness, and in determining the success of the remedy in eliminating the vestiges of the constitutional violations found to exist in KCMSD to the extent practicable. Our earlier opinions which we have discussed above, particularly *Jenkins II* and the district court orders there in issue, set forth in detail the constitutional violations and the impact upon the District. It goes without saying that careful factfinding and detailed articulation of findings will be required, particularly with respect to whether vestiges of discrimination have been eliminated to the extent practicable, and thus certain aspects of KCMSD have become unitary. It is evident that in considering the various parts of the remedy, some questions will be far more easily resolved than others. The improvement of the physical facilities is one that lends itself to relatively simple quantification. Questions of student assignments, faculty and staff composition, as well as extra-curricular activities and facilities, are only slightly more complicated.

When the question of quality of education is reached, however, the issue is far more complex. The district court correctly observed that implementation of programs in and of itself is not sufficient. The test, after all, is whether the vestiges of segregation, here the system-wide reduction in student

10. Another part of the remedy we have stressed repeatedly is the development of a voluntary inter-district plan. We observe once again that the only implementation of any such plan is the ten student exchange with the Missouri City schools.

achievement, have been eliminated to the greatest extent practicable. The success of quality of education programs must be measured by their effect on the students, particularly those who have been the victims of segregation. It will take time to remedy the system-wide *reduction in student achievement* in the KCMSD schools, and the orders of the district court reflect that it is aware of this fact.

We must also recognize that the funding problems are an inherent part of the entire problem in KCMSD, as we observed in *Jenkins II,* 855 F.2d at 1305. The atmosphere within the community and the legal climate within the State have prevented KCMSD from raising the necessary funds to maintain its schools and to fund remedial programs. These are all aspects that the district court must consider as it continues to address this issue in the future.

### III.

■ The State also argues that the district court erred as a matter of law in approving salary increases for KCMSD employees in its order of June 25, 1992. Order of June 25, 1992 at 15–16. The State argues first that the salary increase remedy sought exceeded that necessary to remedy the constitutional violations, and alternatively, that if the district court had lawful authority to impose the increases, it abused its discretion in doing so. We reject the State's arguments and affirm the district court's June 25, 1992 order granting the salary increases.[11]

On September 15, 1987, the district court ordered salary increases to be paid out of the desegregation budget, finding that high quality personnel are necessary not only to implement specialized desegregation programs intended to improve educational opportunities and reduce racial isolation, but also to ensure that there is no diminution in the quality of its regular education programs. *Jenkins v. Missouri,* 672 F.Supp. 400, 410 (W.D.Mo.1987), *aff'd in relevant part,* 855 F.2d 1295 (8th Cir.1988), *cert. denied as to*

*relevant part,* 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). Additional increases to be paid from the desegregation budget were sought in 1990, and after several days of hearings in June of that year, the parties reached a settlement as to salary increases to be paid equally by the State and KCMSD, with KCMSD's fifty percent share to be funded by an increase in the real estate tax levy from $4 per $100 valuation to $4.96. The settlement specifically provided that joint and several liability would not apply to these salary obligations. The parties in this litigation did not appeal from the order, and this court dismissed an appeal filed by a group of taxpayers. *Jenkins v. Missouri,* 967 F.2d 1245, 1248 (8th Cir.) (property owners' notice of appeal was ineffective since they did not move to intervene until time to appeal had already expired), *cert. denied,* —— U.S. ——, 113 S.Ct. 811, 121 L.Ed.2d 684 (1992).

In early 1992 the American Federation of Teachers and KCMSD sought additional increases in salaries to be paid as desegregation expenses. The State opposed the increases and argued that the court should order a roll-back of salaries of the KCMSD staff to the 1986–87 levels because the salary increases did not meet the goals set by the court.

After a hearing lasting four days, the district court entered its order approving the salary increases. Order of June 25, 1992 at 16. The court set forth in detail the respective contentions of the parties and supporting evidence and ordered the State to fund fifty percent of the increases and KCMSD to fund fifty percent, with joint and several liability. Most importantly in this order, the court found that Kansas City, Missouri is part of the national urban market, and that other cities are competing for Kansas City's teachers and staff. The district court found that the State's roll-back proposal would drastically impair implementation of the desegregation remedy. Order of June 25, 1992 at 13. The district court concluded that logic and

---

11. *The salary increases called for in the court's order had been completely paid when argument was heard in this case. Presumably, the State would seek recovery of the funds from KCMSD,* and whether there is a practical effect, in view of joint and several liability, is a question that we need not ponder.

empirical data showed that in an absence of desegregation funding for salaries, the District would not be able to implement the desegregation plan. *Id.* at 12. Quoting *Freeman v. Pitts,* the court found that the "essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action." *Id.* at 12 (quoting *Freeman v. Pitts,* —— U.S. at ——, 112 S.Ct. at 1444). The court referred to its ruling in 1989 that KCMSD's difficulty in hiring and retaining qualified personnel adversely affected the desegregation plan. *Id.* at 13 (citing Order of July 5, 1989 at 23). In approving the 1990 salary package, the court found that salary increases for KCMSD's personnel were "essential to comply with the [c]ourt's desegregation orders." Order of June 25, 1992 at 13 (quoting Order of July 23, 1990 at 6). The district court also referred to its earlier orders and decisions of this court that high quality personnel are necessary not only to implement specialized desegregation programs intended to improve educational opportunities and reduce racial isolation, but also to "insure that there is no diminution in the quality of its regular academic program." *Jenkins v. Missouri,* 672 F.Supp. at 410. The court found: "In order to improve the desegregative attractiveness of the KCMSD, the District must hire and retain high quality teachers, administrators and staff." Order of June 25, 1992 at 15. Finally, the district court concluded that the basis for its ruling is grounded "in remedying the vestiges of segregation by improving the desegregative attractiveness of the KCMSD." *Id.*

The State makes no claim that the findings of fact of the district court are clearly erroneous. Instead, it simply argues that as a matter of law there is no support for the district court's order, and if there is such support, the district court abused its discretion in ordering the salary payments. In great part, the State seems to be urging that we review the issue de novo based upon factual arguments that it now asserts, many based on evaluative criteria it claims the district court had adopted.

The State's legal argument is that the district court should have denied the salary increase funding because it is contrary to *Milliken II* and *Swann* in that it does not directly address and relate to the State's constitutional violation. The State argues that low teacher salaries do not flow from any earlier constitutional violations by the State. The State particularly targets pay of non-teacher personnel as beyond the power of the court to reach.

The State's argument requires that we look again to the finding, which we affirmed in *Jenkins II,* 855 F.2d at 1300, that "[s]egregation has caused a system wide *reduction* in student achievement in the schools of the KCMSD" as well as departures of whites to private schools and suburbs. The goals of the remedial programs are to improve the educational lot of the victims of unconstitutional segregation, to regain some portion of the white students who have fled the District and retain those that are still there, and to redistribute the students within the KCMSD to achieve the maximum desegregation possible. 855 F.2d at 1302. The State has too narrow an approach to the nature of the constitutional violation and injury, which is extremely broad. *See* page 764, *supra.* In addition to compensating the victims, the remedy in this case was also designed to reverse white flight by offering superior educational opportunities. *See Jenkins II,* 855 F.2d at 1302.

Contrary to the State's argument, the issue is not that low teacher pay in and of itself is a constitutional violation that must be remedied, but rather the systemic reduction of student achievement and white flight which require as part of the remedy quality education programs and magnet schools. This remedy finds its earliest support in *Milliken II,* which stated: "In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation.... [T]he decree ... must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" 433 U.S. at 280, 97 S.Ct. at 2757 (citations omitted). *Milliken*

*II* discussed educational remedies deemed necessary to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education provided in a non-discriminatory manner in a school system free from pervasive de jure racial segregation. *Id.* at 282, 97 S.Ct. at 2758. *Milliken II* specifically approved remedial education programs "to overcome past inadequacies and to compensate minority children for unequal educational opportunities resulting from past or present racial and ethnic isolation." *Id.* at 284–85, 97 S.Ct. at 2759–60. Indeed, *Milliken II* looked to habits of speech, conduct, and attitudes reflecting cultural isolation as conditions that the remedy could appropriately address. *Id.* at 287, 97 S.Ct. at 2760.

The establishment of the quality educational programs in KCMSD springs from these roots and from the ample findings that we have reviewed on numerous occasions.

To this beginning proposition we must then add the findings of the district court that salary funding is necessary to implement the desegregation plan. The court stated in its June 1992 order that "[l]ogic and empirical data show that in the absence of desegregation funding for salaries, the district will not be able to implement its segregation plan." Order of June 25, 1992 at 12. It was particularly appropriate that in this same order the district court looked to the language in *Freeman v. Pitts* that "[t]he essence of a court's equity power lies in its inherent capacity to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action," slip op. at 12 (quoting *Freeman*, —— U.S. at ——, 112 S.Ct. at 1444), and further that a district court may require the expenditure of funds to implement a desegregation remedy, slip op. at 12 (citing *Milliken II* ). The court looked to its earlier holdings that KCMSD's difficulty in hiring and retaining qualified personnel adversely affected the desegregation plan. Slip op. at 13. "High quality personnel are necessary not only to implement specialized desegregation programs intended to 'improve educational opportunities and reduce racial isolation,' but also to 'ensure that there is no diminution in the quality of its regular academic program.' " *Id.* at 13 (citing *Jenkins II* ). The court also found that to improve the KCMSD's desegregative attractiveness, KCMSD must be able to hire and retain high quality teachers, administrators, and staff. Slip op. at 15.

What we have said, coupled with the district court's findings detailed above, demonstrates the legal basis for the court's salary orders. Further, as we said in discussing the decay of the district's physical facilities in *Jenkins II*, the constitutional violations by the State and failure to remove the vestiges of the dual school system " 'contributed to, if not precipitated, an atmosphere which prevented the KCMSD from raising the necessary funds to maintain its schools.' " 855 F.2d at 1305. The same principle applies equally to the salary issue before us. In *Jenkins II* we rejected an argument similar to that asserted by the State today. It is also significant that the district court, in its first order relating to salaries, specifically referred to the deterioration in KCMSD's teacher salary position because of failure to obtain passage of a tax levy. *Jenkins v. Missouri*, 672 F.Supp. at 410.

We reject the State's argument that the salary order entered by the district court was without lawful authority. We are satisfied that the district court's factual findings provide sufficient underpinning for the legal conclusion the district court reached in this case.

We need not engage in a detailed analysis of the State's factual arguments. There was substantial evidence to support the district court's findings we have referred to above. Further, the court heard testimony from the State's experts that there was a statistically significant, positive change in the turnover rates for full-time employees after the earlier salary increase, that the percentage of certified employees selecting KCMSD dramatically increased because of the earlier salary increases, that the percentage of employees lost to other school districts after the salary increase declined significantly, and that the average performance evaluation for the professional employees increased positively and significantly. The record provides ample support for the district court's findings, and

we conclude that it did not abuse its discretion in approving the salary increases.

We affirm the various orders entered by the district court.